948 F.2d 1402
 23 Fed.R.Serv.3d 235
 Irwin SCHROB and Barbara L. Schrob, his wife; and Matawan
Building Supplies Corporation
v.
James CATTERSON, Individually and in his capacity as
Assistant United States Attorney for the Eastern District of
New York; David Toracinta, Individually and in his capacity
as a Special Agent of the Drug Enforcement Administration;
John M. Peluso, Individually and in his capacity as a
Special Agent of the Drug Enforcement Administration; U.S.
Department of Justice--United States Attorney; U.S.
Department of Justice--Drug Enforcement Administration;
John Does 1 through 20 and Jane Does 1 through 20, both
Individually and in their capacities as supervisory
personnel over the identified individual defendants or as
persons, presently unknown to plaintiffs, who participated
in the acts and/or omissions alleged in this complaint; and
Joseph V. Zarrelli, both Individually and in his capacity as
an Agent/Informer of the United States law enforcement agencies.
James Catterson, John Peluso and David Toracinta, Appellants.
 No. 90-6051.
 United States Court of Appeals,
Third Circuit.
 Argued May 16, 1991.
Decided Nov. 15, 1991.
Rehearing Denied Dec. 24, 1991.
 
 Stuart M. Gerson, Asst. Atty. Gen., Michael Chertoff, U.S. Atty., Barbara L. Herwig, Jennifer H. Zacks (argued), U.S. Dept. of Justice, Civ. Div., Appellate Staff, and Nancy R. Gaines, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, D.C., for appellants.
 Robert P. Zoller (argued), Janyce W. Stahl, Barbara E. Turen, Hannoch Weisman, Roseland, N.J., for appellees Irwin and Barbara L. Schrob.
 John R. Connelly, Jr., Drazin & Warshaw, Red Bank, N.J., for Joseph V. Zarrelli.
 Before HUTCHINSON, COWEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 I.
 
 1
 Assistant United States Attorney James Catterson (Catterson) and Drug Enforcement Agency (DEA) agents David Toracinta and John Peluso (collectively "the Agents") appeal the order of the United States District Court for the District of New Jersey denying their Rule 12(b)(6) motions to dismiss appellants' complaint against them on the grounds of absolute and qualified immunity. Irwin Schrob, his wife Barbara Schrob, and Matawan Building Supplies (Schrob)[1] filed a complaint containing claims arising under Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Therein they allege that the seizure of Matawan Building Supplies (Matawan) by Catterson and the Agents violated their constitutional rights. Matawan was seized after Catterson filed an in rem civil action seeking forfeiture of 100 percent of the shares of Matawan and certain real and personal property under the civil forfeiture provisions of the Comprehensive Drug Abuse Prevention and Control Act, see 21 U.S.C.A. § 881(a)(6)-(7) (West 1981 & Supp.1991), and seeking an ex parte application for a seizure warrant directing the United States Marshal Service to seize the property.
 
 
 2
 Because we have determined that many of the allegations in the complaint are subject to absolute immunity and should be dismissed, we will reverse the district court's order as to them. We will remand to the district court on the remaining claims and allow the proceedings to continue to the extent necessary to determine whether Catterson and the Agents are entitled to summary judgment on those claims on grounds of qualified immunity.
 
 II.
 
 3
 Schrob's complaint in this action was first filed on January 4, 1990, and amended in April and August of 1990. Schrob alleged that the seizure of Matawan violated his First, Fourth and Fifth Amendment rights and violated the Act. Before filing an answer to Schrob's complaint, Catterson and the Agents moved for dismissal under Federal Rule of Civil Procedure 12(b)(6). Catterson argued that he was entitled to absolute immunity because all of the actions Schrob alleges he committed in violation of the Constitution were made in his core prosecutorial capacity. Alternately, Catterson argued that he was entitled to qualified immunity. The Agents argued that they were entitled to qualified immunity because Schrob's allegations of unconstitutional misconduct on their part were not specific enough to permit an inference that they had unreasonably violated any clearly established constitutional rights.
 
 
 4
 The Rule 12(b)(6) motion to dismiss was filed on October 4, 1990, and heard on October 22, 1990. In a ruling from the bench, the district court dismissed Schrob's First Amendment claim, his claim for violation of the Act, and denied the remainder of the motion. Catterson and the Agents filed their Notice of Appeal on December 21, 1990.
 
 III.
 
 5
 On a motion to dismiss for failure to state a claim, all allegations in the pleadings must be accepted as true and the plaintiff, Schrob, must be given the benefit of every favorable inference that can be drawn from those allegations. See Conley v. Gibson, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 n. 1 (3d Cir.1987) (citations omitted).
 
 
 6
 Schrob's complaint alleged the following facts. Matawan was incorporated in New Jersey in October of 1984 and commenced operations in February of 1985. At its outset, Matawan was owned by Frank J. Esposito (Esposito), Joseph Zarelli (Zarelli), and Schrob.[2] Schrob was actively involved in the day-to-day running of Matawan. Zarelli left Matawan in April 1986 and brought an action against Matawan, Schrob and Esposito. The action was later settled and Zarelli transferred all of his shares to Matawan thereby making Schrob and Esposito fifty percent shareholders in the company.
 
 
 7
 After leaving Matawan, Zarelli contacted the DEA and this contact ultimately led to the investigation and indictment of Esposito on charges of conspiracy to distribute narcotics.[3] Schrob was never investigated or implicated in Esposito's crimes. On January 4, 1988 Catterson filed an in rem complaint in the United States District Court for the Eastern District of New York seeking forfeiture of certain real and personal property of Matawan, Esposito, Schrob and others, under the civil forfeiture provisions of the Comprehensive Drug Abuse Prevention and Control Act (Act), 21 U.S.C.A. § 881(a)(6)-(7). Specifically, the in rem complaint alleged that 100 percent of the shares of Matawan, as well as Esposito's one-third equitable interest in the Matawan business property were the proceeds of, and directly traceable to the sale of a controlled substance in violation of 21 U.S.C.A. § 841. The complaint sought issuance of a warrant directing the U.S. Marshal to seize the property and assets identified in the in rem complaint.
 
 
 8
 At an ex parte hearing on the seizure warrant held on January 5, 1988, Catterson made certain factual misstatements. The magistrate judge, in considering the propriety of seizing the Matawan property and shares, asked Catterson "Am I correct that two of Mr. Esposito's partners had been indicted or convicted?" and Catterson responded "That is correct." Appendix (App.) at 42, p 21. While two of Esposito's associates had in fact been convicted in connection with cocaine sales, Esposito's two partners in Matawan, Schrob and Zarelli, were in no way implicated in Esposito's drug sales. Schrob alleges that the magistrate judge issued the seizure warrant in reliance on these misstatements. The warrant was issued that day and approximately thirty Deputy United States Marshals seized the shares, business and property of Matawan, directed customers to leave the premises and fired certain employees. Matawan's bank accounts were seized and frozen and normal business activities came to a complete halt. An article in the local newspaper detailed the seizure.
 
 
 9
 After the seizure was effected, Schrob met with Catterson and demonstrated the legitimacy of his investment in Matawan and that Esposito had only capitalized one-third of the business. Following a period of negotiations, control of Matawan was returned to Schrob. Schrob alleges that the return of control was unduly delayed because Catterson demanded numerous "unreasonable and unjustified" restrictions on operation of the business, as well as a release from personal liability for his actions related to the seizure. Although Schrob agreed to the restrictions, no such release was ever signed. Complete control of the company was returned to Schrob within one week.
 
 IV.
 
 10
 The district court had jurisdiction pursuant to 28 U.S.C.A. § 1331 (West Supp.1991). We have appellate jurisdiction over the interlocutory order denying Catterson's and the Agents' claims to absolute or qualified immunity under the collateral order doctrine espoused in Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).[4] The Supreme Court has repeatedly held that a district court's denial of absolute immunity is an appealable interlocutory order. See, e.g., Nixon v. Fitzgerald, 457 U.S. 731, 742, 102 S.Ct. 2690, 2697, 73 L.Ed.2d 349 (1982). The Court has also held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). Thus, we assert jurisdiction over the district court's denial of absolute and qualified immunity under the Cohen doctrine.[5]
 
 
 11
 Since we are duty bound to examine our own jurisdiction, we are constrained to point out, sua sponte, that the district court never filed an official order denying the motion to dismiss. Instead, it simply said that "the transcript will be your order because it is too complicated to convert into a small order. You can take your guidance from that." App. at 31. Accordingly, the transcript itself was listed on the district court docket in lieu of a formal order.
 
 
 12
 We do not approve of this procedure, but we think that a holding that it deprives us of appellate jurisdiction would exalt form over substance. The district court should not have neglected memorializing its decision with a written order. Admittedly, an order dealing with each allegation as to the presence of absolute or qualified immunity on the face of the complaint would not be simple, but the district court's failure to issue such an order complicates our appellate review. Although the docketed transcript of the hearing at the end of which the district court denied the Rule 12(b)(6) motion of Catterson and the Agents sets out the district court's decision to deny the Rule 12(b)(6) motion to dismiss and gives us enough information to review that order, we cannot understand why the district court found it too difficult to craft an order with respect to the various claims Schrob set out in the following format: "For the reasons stated at the hearing, defendant's motion to dismiss is denied with respect to the claims alleged in p's X and Y," or "the motion to dismiss the claim that A and B did Z, as set out in p's R, S, T and U, which we summarize as follows...."
 
 
 13
 On the jurisdictional problem that the district court's failure to craft such an order creates, we believe that the rationale underlying the Supreme Court's decision in Banker's Trust Co. v. Mallis, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978) (per curiam) is controlling. Although the district court in Banker's Trust failed to file a judgment separate from its opinion, rather than a separate order as in this case, see id. at 382 n. 1, 98 S.Ct. at 1119 n. 1, the Court's rationale is instructive. The Supreme Court said:
 
 
 14
 [S]trict compliance with the separate-judgment requirement [would not] aid the court of appeals determination of whether the decision of the District Court was "final" for purposes of § 1291. Even if a separate judgment is filed, the courts of appeals must still determine whether the district court intended the judgment to represent the final decision in the case.
 
 
 15
 Id. at 385 n. 6, 98 S.Ct. at 1120 n. 6. We think it would be equally inefficient to remand this case because the district court refused to enter and docket a statement headed "order" apart from its ruling in the transcript that it did docket. Cf. Temple Univ. v. White, 941 F.2d 201, 216 (3d Cir.1991) (rationale of Banker's Trust does not apply in absence of entry in clerk's docket). We do, however, instruct the district court to file separate, written orders in the future.
 
 V.
 
 16
 Our review of the district court's denial of Catterson's and the Agents' motion to dismiss is plenary. See D.P. Enters., Inc. v. Bucks County Community College, 725 F.2d 943, 944 (3d Cir.1984) (citations omitted). In deciding a motion to dismiss, all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them. Id. A complaint can only be dismissed if "it appears to a certainty that no relief could be granted under any set of facts which could be proved." Id.
 
 VI.
 
 17
 Initially, we must address two immunity issues. We must first identify which allegations against Assistant United States Attorney Catterson involve core prosecutorial functions and can thereby be dismissed on grounds of absolute immunity under the Supreme Court's decisions in Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) and Burns v. Reed, --- U.S. ---, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991).[6] We will then address those allegations requiring the submission of further proofs on remand. We will remand these remaining claims to the district court, recognizing the rights of Catterson and the Agents to prove that their actions are protected by qualified immunity. The district court can more appropriately decide these issues on summary judgment, after supplementation of the record.
 
 A. Absolute Immunity
 
 18
 The Supreme Court of the United States has provided guidance on the issue of prosecutorial immunity. In Imbler, the Supreme Court extended absolute immunity to prosecutors when their "activities were intimately associated with the judicial phase of the criminal process." Imbler, 424 U.S. at 430, 96 S.Ct. at 995 (emphasis added). The Court's holding was narrow: "We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." Id. at 431, 96 S.Ct. at 995 (footnote omitted). Although the Court in Imbler left open the question whether absolute immunity would apply to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate," id. at 430-31, 96 S.Ct. at 995, the Court addressed these contours of the prosecutorial function in its recent decision in Burns v. Reed. In Burns, the Court extended absolute immunity to a prosecutor's participation in a probable cause hearing for the issuance of a search warrant, but only extended qualified immunity to a prosecutor's giving of legal advice to the police. Id. at 1942, 1944-45.
 
 
 19
 While Burns and Imbler both concerned claims against state prosecutors under 42 U.S.C.A. § 1983, courts have generally relied upon the principles developed in the case law applying section 1983 to establish the outer perimeters of a Bivens claim against federal officials. It would be "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978); see Brawer v. Horowitz, 535 F.2d 830, 834 (3d Cir.1976).
 
 
 20
 We begin our analysis with recognition of "[t]he presumption ... that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties," Burns, 111 S.Ct. at 1939, and that the Supreme Court has been "quite sparing" in its recognition of absolute immunity. Id. (citing Forrester v. White, 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988)). The Supreme Court has outlined a "functional" approach to immunity issues. Id.; Harlow, 457 U.S. at 811, 102 S.Ct. at 2734. Under this approach, "we examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." Forrester v. White, 484 U.S. at 224, 108 S.Ct. at 542; see Mireles v. Waco, --- U.S. ---, 112 S.Ct. 286, 288, 116 L.Ed.2d 9 (1991) (per curiam) ("relevant inquiry is the 'nature' and 'function' of the act, not the 'act itself' "). Our inquiry centers on the nature of the official behavior challenged and not the title or status of the officer.
 
 
 21
 We will proceed by isolating the particular instances of prosecutorial behavior alleged in this case. Catterson's alleged conduct can be divided into four separate categories:
 
 
 22
 (1) creation and filing of the in rem complaint; (2) preparation of and application for the seizure warrant; (3) participation in the ex parte hearing for the issuance of the seizure warrant; and (4) actions surrounding the seizure, retention and release of the Matawan property. If any of the allegations of the complaint involve prosecutorial functions protected by absolute immunity under the principles enunciated in Imbler and Burns, they must be dismissed without reference to the type of behavior complained of. "[I]t has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to constant dread of retaliation." Imbler, 424 U.S. at 428, 96 S.Ct. at 994 (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir.1949) (Hand, J.), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950)).
 
 1.
 
 23
 First, we consider Catterson's actions in creating and filing the in rem complaint.[7] Imbler held that, in light of the immunity historically accorded prosecutors at common law and the interests supporting that immunity, prosecutors are absolutely immune from liability for their conduct in "initiating a prosecution and in presenting [the Government's] case." Id. at 431, 96 S.Ct. at 995. In Imbler, the plaintiff, a defendant in a state criminal proceeding, sued the state prosecutor under section 1983 for his alleged knowing use of perjured testimony at trial and suppression of exculpatory evidence. Id. at 416, 96 S.Ct. at 988. The Court considered three factors in determining whether the prosecutor was entitled to absolute immunity: (1) whether there is a common law basis for the immunity in question; (2) whether performance of the prosecutorial function poses a risk of harassing or vexatious litigation against the official; and (3) whether there exist alternatives to damage suits against the official as a means of redressing wrongful conduct. Id. at 424-27, 96 S.Ct. at 992-93; Burns, 111 S.Ct. at 1942-44.
 
 
 24
 The Court stated that the common law immunity of a prosecutor from suits for malicious prosecution is based on "concern[s] that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." Imbler, 424 U.S. at 423, 96 S.Ct. at 991. The Court determined that "the same considerations of public policy that underlie the common-law rule likewise countenance absolute immunity under § 1983." Id. at 424, 96 S.Ct. at 992. The Court stated:
 
 
 25
 A prosecutor is duty bound to exercise his best judgment both in deciding which suit to bring and in conducting them in court. The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages. Such suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate.
 
 
 26
 Id. at 424-25, 96 S.Ct. at 992 (citations omitted).
 
 
 27
 The Imbler Court also observed that there are checks on prosecutorial misconduct in the judicial process, criminal law and professional discipline. Post-trial procedures such as "the remedial powers of the trial judge, appellate review, and state and federal post-conviction collateral remedies" are available to determine whether an accused has received a fair trial. Id. at 427, 96 S.Ct. at 993; see also Butz, 438 U.S. at 512, 98 S.Ct. at 2914 ("[T]he safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct."). Absolute immunity does not place prosecutors beyond the reach of the criminal law, see 18 U.S.C.A. § 242 (West Supp.1991),[8] and "a prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers." Imbler, 424 U.S. at 429, 96 S.Ct. at 994; see also Burns, 111 S.Ct. at 1939.
 
 
 28
 Post-Imbler decisions have generally upheld prosecutorial immunity in cases involving the initiation of a prosecution, or the indictment or filing of charges against an individual. See, e.g., Wilkinson v. Ellis, 484 F.Supp. 1072, 1081 (E.D.Pa.1980); Coggins v. Carpenter, 468 F.Supp. 270, 283-84 (E.D.Pa.1979). A prosecutor's alleged failure to properly investigate before initiating a prosecution is also conduct within the scope of absolute immunity. See Rose v. Bartle, 871 F.2d 331, 345 & n. 12 (3d Cir.1989) (absolute immunity from allegation of instituting grand jury proceedings without investigation and without good faith belief that any wrongdoing occurred); Henzel v. Gerstein, 608 F.2d 654, 657 (5th Cir.1979) (alleged failure to investigate prior to filing information protected by absolute immunity).
 
 
 29
 The issue in this case is whether the rationale of Imbler applies to a prosecutor's initiation of an in rem civil proceeding for the forfeiture of criminal property. See United States v. 6109 Grubb Road, 886 F.2d 618, 621 (3d Cir.) (in rem forfeiture proceeding under 21 U.S.C.A. § 881 is civil proceeding), reh'g denied, 890 F.2d 659 (3d Cir.1989). Although the Supreme Court has never addressed the scope of prosecutorial immunity in a civil proceeding, in Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Court recognized that "there are some officials whose special functions require a full exemption from liability" and granted absolute immunity to federal attorneys in an administrative agency action. Id. at 508, 98 S.Ct. at 2911-12 (citations omitted). In Butz, the Department of Agriculture issued an administrative complaint seeking to revoke or suspend the registration of a commodity futures commission merchant for failure to maintain minimum financial requirements. After an unsuccessful enforcement proceeding by the Department, the merchant brought a Bivens action for damages against various federal officials, including Department of Agriculture attorneys who prosecuted the proceeding. Id. at 481-83, 98 S.Ct. at 2897-99. The Court, stating that "[t]he cluster of immunities protecting the various participants in judge-supervised trials stems from the characteristics of the judicial process rather than its location," id. at 512, 98 S.Ct. at 2913, granted absolute immunity to the Department of Agriculture attorneys performing functions analogous to those of a prosecutor. The Court said:
 
 
 30
 The decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought....
 
 
 31
 The discretion which executive officials exercise with respect to the initiation of administrative proceedings might be distorted if their immunity from damages arising from that decision was less than complete.
 
 
 32
 Id. at 515, 98 S.Ct. at 2915. Thus, absolute immunity is extended to officials when their duties are functionally analogous to those of a prosecutor's, regardless of whether those duties are performed in the course of a civil or criminal action. See id.
 
 
 33
 An additional factor in Butz was that the defendant in an administrative enforcement proceeding is able to challenge the legality of the proceeding. In Imbler, the Court noted that the safeguards of the judicial process served as a restraint on prosecutorial misbehavior. Imbler, 424 U.S. at 427-29, 96 S.Ct. at 993-94. The Butz Court reasoned that adjudication within a federal administrative agency "shares enough characteristics of the judicial process" to justify absolute immunity. Butz, 438 U.S. at 513, 98 S.Ct. at 2914. Further, it stated that the defendant in an enforcement proceeding has "ample opportunity to challenge the legality of the proceeding." Id. at 515, 98 S.Ct. at 2915. The claimant in Butz was able to quash the administrative order entered against him by means of judicial review. Id. at 516, 98 S.Ct. at 2915.
 
 
 34
 The proceeding in this case, filing an action against guilty property, is even more intimately connected with the criminal process than the administrative agency hearing in Butz. The purpose of the forfeiture provisions is to seize property linked to criminal drug transactions. In rem forfeiture is based on the fiction that the property itself is guilty of a crime. See CaleroToledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 680-84, 94 S.Ct. 2080, 2090-92, 40 L.Ed.2d 452 (1974). All "right, title, and interest" in the property vests in the United States "upon commission of the act giving rise to forfeiture." 21 U.S.C.A. § 881(h) (West Supp.1991).
 
 
 35
 Furthermore, an Assistant United States Attorney is not only a prosecutor, but also the government's advocate in civil litigation. See Fry v. Melaragno, 939 F.2d 832 (9th Cir.1991) (absolute immunity extended to Internal Revenue Service attorneys in civil enforcement proceedings); Meade v. Grubbs, 841 F.2d 1512, 1532-33 & n. 18 (10th Cir.1988) (official entitled to absolute immunity for alleged failure to initiate civil or criminal complaint); Flood v. Harrington, 532 F.2d 1248, 1251 (9th Cir.1976) (absolute immunity for government attorneys in civil enforcement action); see also Meyers v. Contra Costa County Dep't of Social Servs., 812 F.2d 1154, 1157 (9th Cir.) (child services worker absolutely immune for initiating and pursuing civil child dependency proceedings), cert. denied, 484 U.S. 829, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987). From the policy perspective of protecting the judicial process announced in Imbler and Butz, there should be no distinction between a prosecutor acting as the government's advocate in a criminal or civil proceeding. Exposing a prosecutor to personal liability for initiating an in rem proceeding may cause him to hesitate before carrying out his duty to confiscate the proceeds of drug transactions.
 
 
 36
 We also believe that the owner of the defendant property in a forfeiture proceeding has sufficient opportunity to challenge the legality of the proceeding to justify granting absolute immunity to a prosecutor in bringing a civil forfeiture action. The forfeiture statute protects innocent owners of property by providing that "no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." 21 U.S.C.A. § 881(a)(6); id. § 881(a)(7); see United States v. 92 Buena Vista Ave., 937 F.2d 98, 101-03 (3d Cir.1991) (discussing innocent owner defense). A person whose property has been seized can seek administrative or judicial relief.[9] See Menkarell v. Bureau of Narcotics, 463 F.2d 88, 93 (3d Cir.1972). Further, while the drug forfeiture laws provide immunity for government officials "lawfully engaged" in enforcing the laws, see 21 U.S.C.A. § 885(d) (West 1981),[10] there is no immunity from criminal liability for unlawful enforcement actions such as exceeding authority in executing a search warrant or maliciously procuring a search warrant. See 18 U.S.C.A. §§ 2234-35 (West 1984). The prosecutor is also subject to professional discipline. These alternative remedies suggest that it is not necessary to subject prosecutors to personal liability to encourage them to conform their actions to the dictates of the law. We find that Catterson's actions in initiating the in rem prosecution in this case are protected by absolute immunity.
 
 2.
 
 37
 We next consider the more difficult category of Catterson's alleged actions in the preparation of and application for the seizure warrant.[11] In Burns, the Supreme Court considered absolute immunity in the context of a prosecutor's application for a search warrant of a house. The court specifically limited its holding to the prosecutor's "participation" in the probable cause hearing to obtain the warrant and rejected Justice Scalia's conclusion that the complaint encompassed the prosecutor's actions in seeking the search warrant. Burns, 111 S.Ct. at 1940-41 & n. 5.
 
 
 38
 Justice Scalia, in his concurring and dissenting opinion, considered whether absolute immunity attached to the prosecutor's decision to apply for the search warrant. Id. at 1947-48 (Scalia, J., concurring and dissenting). At common law, he said, there was no immunity for procuring a search warrant. Justice Scalia compared the prosecutor's role in seeking a search warrant to the prosecutor's role in seeking an indictment as discussed in Imbler, and to the role of the policeman in seeking an arrest warrant. Id. at 1949 (Scalia, J., concurring and dissenting). In Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), the Supreme Court declined to extend absolute immunity to a policeman's actions in seeking an arrest warrant because it "is further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment." Id. at 342-43, 106 S.Ct. at 1097. Justice Scalia found that "[t]he act of procuring a mere search warrant is further removed still." Burns, 111 S.Ct. at 1949 (Scalia, J., concurring and dissenting) (emphasis in original).
 
 
 39
 The activities of a prosecutor in seeking a seizure warrant fall within a "gray" area not easily classifiable as core prosecutorial functions. In Imbler, the Court recognized that the prosecutor's role as an advocate may take the prosecutor beyond the confines of the courtroom:
 
 
 40
 A prosecuting attorney is required, constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute [and] whether to dismiss an indictment against particular defendants.... Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluation of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them.
 
 
 41
 Imbler, 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33. The present case involves us in such a line-drawing process. We will apply, to the best of our ability, the functional test outlined by the Supreme Court in determining whether Catterson's actions in seeking a seizure warrant are so intimately and inexorably tied to the prosecutorial phase of the judicial process as to warrant the blanket protection that absolute immunity affords. See Harlow, 457 U.S. at 811 & n. 16, 102 S.Ct. at 2734 & n. 16; Imbler, 424 U.S. at 430, 96 S.Ct. at 995.
 
 
 42
 When the prosecutor's conduct consists of purely investigative matters, courts have declined to apply absolute immunity. See Burns, 111 S.Ct. at 1942-45 (no absolute immunity for prosecutor's giving of advice to police during investigation); Marrero v. City of Hialeah, 625 F.2d 499, 505 (5th Cir.1980) ("a prosecutor who assists, directs or otherwise participates ... in obtaining evidence prior to an indictment undoubtedly is functioning more in his investigative capacity than in his quasi-judicial capacities of 'deciding which suits to bring and ... conducting them in court' ") (quoting Imbler, 424 U.S. at 424, 96 S.Ct. at 992), cert. denied, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981).
 
 
 43
 Although this Court has often stated that a prosecutor is not entitled to absolute immunity when engaged in purely investigative activities, this Court has never been asked to clarify the gray areas between prosecutorial and investigative activity. See, e.g., Mancini v. Lester, 630 F.2d 990, 993 (3d Cir.1980) (per curiam); Helstoski v. Goldstein, 552 F.2d 564, 566 (3d Cir.1977); cf. Forsyth v. Kleindienst, 599 F.2d 1203 (3d Cir.1979) (qualified immunity for Attorney General's decision to authorize warrantless electronic surveillances during investigation and remand for further fact-finding on entitlement to absolute immunity), cert. denied, 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981). Further, no court, to our knowledge, has ever considered prosecutorial immunity in the context of a civil forfeiture. We look for guidance to the decisions of other federal courts granting or denying absolute or qualified immunity to prosecutors seeking search or arrest warrants.
 
 
 44
 There is a conflict among the cases addressing absolute immunity in the context of the prosecutorial decision to seek an arrest or search warrant. See generally Annotation, Immunity of Prosecutor From Suit, 67 A.L.R. Fed. 640 (1984 & Supp.1990). In Joseph v. Patterson, 795 F.2d 549 (6th Cir.1986), cert. denied, 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 516 (1987), the Josephs asserted that the prosecutor's conduct--making false statements to support a complaint, arrest warrant and a search warrant, participation in an unlawful search, and malicious prosecution--constituted investigative activities not protected by absolute immunity. Id. at 553. The court found that the decision to file a criminal complaint and seek issuance of an arrest warrant were quasi-judicial duties involved in "initiating a prosecution." Id. at 555 (quoting Imbler, 424 U.S. at 431, 96 S.Ct. at 995). The court found that "securing the person of the defendant is part of initiating a prosecution and should be insulated. 'Without the presence of the accused, the initiation of the prosecution would be futile.' " Id. at 556 (quoting Lerwill v. Joslin, 712 F.2d 435, 438 (10th Cir.1983) (prosecutor seeking arrest warrant entitled to absolute immunity)).[12] With respect to the prosecutor's actions in seeking issuance of the search warrant, the court in Patterson recognized that such conduct involves initiating a prosecution, as well as the investigatory function of obtaining evidence prior to an indictment. The court held that a further factual inquiry was necessary to determine the role in which the activity was conducted. Id. at 556-57.
 
 
 45
 Several courts have drawn a distinction between a prosecutor's actions in obtaining a search warrant prior to the filing of a complaint or indictment and subsequent to such a filing. In Maxfield v. Thomas, 557 F.Supp. 1123 (D. Idaho 1983), the court held that the prosecutor's actions in drafting and applying for a search warrant after the filing of a criminal complaint were entitled to absolute immunity, while opining in dicta that a pre-complaint application would have constituted investigatory conduct entitled only to qualified immunity. Id. at 1129; cf. Ehrlich v. Giuliani, 910 F.2d 1220 (4th Cir.1990) (prosecutor's post-indictment actions in obtaining order to freeze assets for forfeiture protected by absolute immunity). In McSurely v. McClellan, 697 F.2d 309 (D.C.Cir.1982), suit was brought against a state prosecutor alleging, inter alia, that he prepared arrest and search warrants that were unconstitutional. The court found that preparation of the warrants and participation in the search and seizure were not core prosecutorial functions because "they involve[d] not the protected decision to initiate prosecution, but rather the earlier, preliminary gathering of evidence which may blossom into a potential prosecution." Id. at 320; cf. Liffiton v. Keuker, 850 F.2d 73, 77 (2d Cir.1988) (prosecutor's application to court for wiretap warrant prior to indictment was investigative and not prosecutorial function entitled to absolute immunity).
 
 
 46
 A seizure warrant can be analogized to both a search warrant and an arrest warrant. The forfeitures provision of the Act provides:
 
 
 47
 The Government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure.
 
 
 48
 21 U.S.C.A. § 881(b) (emphasis added).[13] The distinction between pre- and post-indictment applications for a search warrant, however, does not apply to a seizure warrant. The property sought under the seizure warrant is considered tainted upon the commission of the wrongful act and the government's interest in the property vests at the time of the act. See 21 U.S.C.A. § 881(h). The prosecutor is not gathering evidence under a seizure warrant, but has already decided to bring an action for forfeiture against the guilty property. Thus, a seizure warrant is a necessary first step in the statutory forfeiture process. The in rem complaint and the seizure warrant are intimately connected--one follows the other and effectuates it.
 
 
 49
 A seizure warrant is also closely analogous to an arrest warrant. The warrant "arrests" the property that is the subject of the forfeiture action. See Supp.R. for Certain Admiralty and Maritime Claims C(3). In Lerwill v. Joslin, 712 F.2d 435, 437-38 (10th Cir.1983), the court held that a prosecutor's act of seeking a warrant for the arrest of a defendant against whom he had filed charges is part of his initiation of the prosecution protected under Imbler. The court said that "[t]he purpose of obtaining an arrest warrant is to ensure that the defendant is available for trial, and if found guilty, for punishment." Id.
 
 
 50
 In Ehrlich v. Giuliani, in granting absolute immunity, the court analogized the seizure of property to a prosecutor's act of seeking an arrest warrant. In Ehrlich, an investor brought a Bivens action against two federal prosecutors who inadvertently froze his investment account for forfeiture purposes under RICO. The prosecutors froze the account subsequent to an indictment of a person with the same first and last name as the investor. Ehrlich, 910 F.2d at 1221. The court found that the prosecutors were engaged in more than investigative activity: "One of the most important duties of a prosecutor pursuing a criminal proceeding is to ensure that defendants, or in this case the assets, are present at trial." Id. at 1223. The Supreme Court has also analogized the seizing of property to the indictment of a criminal defendant. United States v. $8,850 in U.S. Currency, 461 U.S. 555, 564, 103 S.Ct. 2005, 2012, 76 L.Ed.2d 143 (1983). Like an arrest warrant, a seizure warrant is necessary to assure the availability of property subject to forfeiture and the warrant effectuates the arrest of the property.
 
 
 51
 "[T]he decisional process ... of judicial line-drawing ... can [also] be aided by an examination of the policies underlying the question at issue." Wilkinson, 484 F.Supp. at 1083. Thus, our decision is also "influenced by the functions immunity serves." See Buckley v. Fitzsimmons, 919 F.2d 1230, 1239 (7th Cir.1990), vacated, --- U.S. ---, 112 S.Ct. 40, 116 L.Ed.2d 19 (1991). We believe that under the unique procedures of forfeiture, the seizure warrant is an integral part of the forfeiture complaint and the decisions to file the complaint and seek the warrant should be considered as one. The "investigative" label placed on a prosecutor's actions in seeking arrest and search warrants does not apply in the forfeiture context. We also believe that the procedural safeguards under the forfeiture laws reduce the need for private damage actions as a means of redressing unconstitutional conduct by a prosecutor. See Butz, 438 U.S. at 512, 98 S.Ct. at 2913.
 
 
 52
 For all of the above reasons, we hold that a prosecutor seeking a seizure warrant is performing "the preparation necessary to present a case" and such preparation is encompassed within the prosecutor's advocacy function. See Rose, 871 F.2d at 344. Schrob's allegations that Catterson sought the warrant without adequate investigation do not change our decision. See id. at 347 n. 12 (institution of grand jury proceedings without investigation and without a good faith belief that any wrongdoing had occurred was "clearly ... encompassed by the 'immunity doctrine as intimately associated with the judicial phase of the criminal process' ") (quoting Imbler, 424 U.S. at 430, 96 S.Ct. at 995); Grant v. Hollenbach, 870 F.2d 1135, 1138-39 (6th Cir.1989) (absolute immunity for prosecutor's decision to investigate or not to investigate). Absolute immunity applies if the action at issue was taken in furtherance of prosecutorial duties even though the prosecutor inadvertently injures an innocent person. See Atkins v. Lanning, 556 F.2d 485, 487-88 (10th Cir.1977) (per curiam) (district attorney absolutely immune from suit for naming wrong person in arrest warrant). Thus, Catterson is also protected by absolute immunity for his actions in seeking the seizure warrant.
 
 3.
 
 53
 Schrob's challenge to Catterson's participation in the seizure warrant hearing is easily disposed of.[14] The district court erroneously stated that if, as alleged, Catterson told a "bald faced lie" to the judge in applying for the seizure warrant, he "can't be immune." App. at 26. Prosecutors and other lawyers were absolutely immune at common law for making false or defamatory statements in judicial proceedings. See, e.g., Yaselli v. Goff, 12 F.2d 396, 400-02 (2d Cir.1926), summarily aff'd, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927). The Supreme Court, and this Court, have held that absolute immunity applies to a prosecutor's knowing use of perjured testimony in a judicial proceeding. Imbler, 424 U.S. at 424-27, 96 S.Ct. at 992-93; Brawer v. Horowitz, 535 F.2d 830 (3d Cir.1976); see also Briscoe v. LaHue, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (policeman who gave perjured testimony at criminal trial entitled to absolute immunity).
 
 
 54
 In Burns, the Supreme Court held that the prosecutor's actions in appearing before a judge and presenting evidence in support of a search warrant application "clearly involve the prosecutor's 'role as advocate for the State,' rather than his role as 'administrator or investigative officer.' " Burns, 111 S.Ct. at 1942 (quoting Imbler, 424 U.S. at 430-31, 96 S.Ct. at 995). For similar reasons, we hold that a prosecutor's actions and statements before a judge in support of an in rem complaint and seizure warrant are entitled to absolute immunity.
 
 4.
 
 55
 With respect to the fourth category, Catterson's post-seizure actions involving the Matawan property, it will be important to determine the "precise claim" that Schrob has made against Catterson. See id. at 1940. The complaint does not allege that Catterson participated in the seizure of the Matawan premises. The allegations in connection with conduct following the seizure were, in summary, (1) delay of the restoration of control of Matawan to Schrob; (2) an unlawful demand for a personal indemnification release from Schrob as a condition of returning Matawan; (3) interference with business and personal relationships; (4) wrongful termination of Matawan employees; and (5) mismanagement of Matawan during the period of seizure.[15] We must determine whether Catterson's participation in these post-seizure events is sufficiently related to the judicial process to warrant the protection of absolute immunity.
 
 
 56
 In Burns, the Supreme Court considered whether absolute immunity was applicable to a prosecutor's actions in giving legal advice to police regarding the use of hypnosis and the existence of probable cause to arrest. The Court first noted that there was no common law immunity for such actions. Burns, 111 S.Ct. at 1943. The Court found that absolute immunity is designed to free the "judicial process" from the harassment and intimidation associated with litigation, and that the prosecutor's giving of legal advice to the police was not closely associated with the judicial process. Id. at 1944; see Mitchell, 472 U.S. at 520-21, 105 S.Ct. at 2812-13 (Attorney General not absolutely immune from liability for authorizing warrantless wiretap, even though wiretap related to a potential prosecution). A final factor in the Court's decision was the absence of a sufficient "check" on the prosecutor's actions:
 
 
 57
 [O]ne of the most important checks, the judicial process, will not necessarily restrain out-of-court activities by a prosecutor that occur prior to the initiation of a prosecution, such as providing legal advice to the police. This is particularly true if a suspect is not eventually prosecuted. In those circumstances, the prosecutor's action is not subjected to the "crucible of the judicial process."
 
 
 58
 Burns, 111 S.Ct. at 1944 (quoting Imbler, 424 U.S. at 440, 96 S.Ct. at 999 (White, J., concurring in the judgment)).
 
 
 59
 Catterson does not dispute the absence of common law immunity for his actions concerning the retention and alleged mismanagement of the seized property. We too believe that Catterson's management of and negotiations concerning return of the property are not directly related to the judicial process. Instead, he was acting in an administrative role. See Forrester, 484 U.S. at 227, 108 S.Ct. at 544 (judge entitled only to qualified immunity when performing administrative functions). In Coleman v. Turpen, 697 F.2d 1341 (10th Cir.1982) (per curiam), the defendant was arrested for murder and his tools and vehicle were seized as evidence. Sometime during his trial, the vehicle was sold for a fraction of its value to pay the sheriff department's storage expenses, and the tools were retained after the trial. See id. at 1343. The court held that the prosecutor was entitled to only qualified immunity from the defendant's due process challenge under section 1983 for his role in managing the post-trial disposition of seized property not used as evidence. The court said that "[a] prosecutor's knowledge that he may be liable if he participates in the illegal sale of seized property will not make him hesitate to initiate a case or introduce seized property as evidence." Id. at 1346; see also Lavicky v. Burnett, 758 F.2d 468, 476 (10th Cir.1985) (prosecutor acts in administrative role in managing post-trial disposition of seized property and thus receives only qualified immunity), cert. denied, 474 U.S. 1101, 106 S.Ct. 882, 88 L.Ed.2d 917 (1986).
 
 
 60
 The rationale of Imbler does not apply to Catterson's post-seizure actions in managing the Matawan property. Qualified immunity will provide sufficient protection to prosecutors managing seized property. Further, as seized property is often managed by DEA agents or the United States Marshal's Service, see D. Smith, supra note 9, pp 8.01-8.06, who would at best have qualified immunity for their actions, we see no reason why a prosecutor should receive absolute immunity for performing the same administrative function. Cf. Burns, 111 S.Ct. at 1944 ("police, who do not ordinarily hold law degrees, would be required to know the clearly established law, but prosecutors would not"). Qualified immunity "provides ample support to all but the plainly incompetent or those who knowingly violate the law." Malley, 475 U.S. at 341, 106 S.Ct. at 1096. Although the absence of absolute immunity may cause prosecutors to consider their actions more carefully, " '[w]here an official could be expected to know that his conduct would violate statutory or constitutional rights, he should be made to hesitate.' " Burns, 111 S.Ct. at 1944 (quoting Harlow, 457 U.S. at 819, 102 S.Ct. at 2738).
 
 
 61
 We also reject Catterson's argument that his actions in negotiating for a release of liability are similar to plea bargaining and thus protected by absolute immunity. See Taylor v. Kavanaugh, 640 F.2d 450, 453 (2d Cir.1981) (prosecutor entitled to absolute immunity for allegedly lying during plea negotiations and violating terms of plea agreement). We recognize that decisions to release property when value is paid or to grant a petition for remission involve prosecutorial discretion. See 19 U.S.C.A. § 1614; id. § 1618. Catterson's actions in negotiating for a personal release in this case are unrelated to a statutory petition for remission or mitigation of a seizure. When a party petitions for remission, the validity of the seizure is presumed and the property is returned only as a matter of leniency. See id. § 1618. In contrast, the seizure of Schrob's property and shares in Matawan was not authorized from the outset under 21 U.S.C.A. § 881(a)(6), a fact implicitly conceded by the government. Accordingly, the shares and property should have been immediately released. Absolute immunity for Catterson's actions is not required to protect prosecutorial actions affecting the judicial process.
 
 
 62
 A significant factor in our decision to deny Catterson absolute immunity in connection with the retention and management of the seized property is that, as in Burns, the judicial process will not serve as an adequate check on a prosecutor's actions in those respects. In cases such as the present one, where the seizure is not authorized from the start, the property is returned without judicial process when the government admits its mistake. When such a wrongful seizure occurs, it causes the owner to lose the value of his property so long as it remains in government hands. A grant of absolute immunity for such actions would allow the government to seize property wrongfully without accountability.[16]
 
 
 63
 Finally, the complaint alleges that Catterson made false statements in the press and to the public about the seizure.[17] This Court has stated that such conduct by a prosecutor is not protected by absolute immunity. See Helstoski v. Goldstein, 552 F.2d at 566 (prosecutor's alleged leaks of false information to press protected at most by qualified immunity); see also Powers v. Coe, 728 F.2d 97 (2d Cir.1984) (same). Talking to the press is, at best, only an administrative function. Accordingly, we hold that Catterson is only entitled to qualified immunity for any statements he made to the press. On remand, the district court will need to determine just what basis, if any, Schrob has for asserting a constitutional violation on these particular facts.
 
 
 64
 Consistent with our conclusion that when a prosecutor acts outside of the "judicial process," he acts outside the protection of absolute immunity, Catterson is entitled only to qualified immunity for his alleged actions in managing and retaining the Matawan property, negotiating a release from liability, and making false statements to the press. Catterson will be shielded from liability if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738 (citations omitted); see Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039-40, 97 L.Ed.2d 523 (1987).[18] Since a motion to dismiss is determined from the face of the complaint, Catterson must be given an opportunity on remand to show that there is no genuine issue of material fact concerning the "objective reasonableness of his conduct," or that he had no involvement in the actions alleged. The limited record before this Court precludes us from making such a determination. See Brown v. United States, 851 F.2d 615, 619-20 (3d Cir.1988) (record provided insufficient basis for resolution of qualified immunity issue on appeal).
 
 B. Immunity of the Agents
 
 65
 The Agents are entitled to qualified immunity for their actions if they can demonstrate the objective reasonableness of those actions. See Anderson, 483 U.S. at 641, 107 S.Ct. at 3039-40 (FBI agent entitled to qualified immunity for warrantless search of home upon showing of objective reasonableness of actions); Malley, 475 U.S. at 341, 106 S.Ct. at 1096 (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").
 
 
 66
 The Agents contend that they are entitled to qualified immunity because the complaint does not specifically or adequately allege any conduct by the Agents that violated Schrob's constitutional rights. See Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3d Cir.1988) (complaint must provide "a modicum of factual specificity, identifying the particular conduct of defendants that is alleged to have harmed the plaintiffs"), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989). It is not clear from the complaint whether the Agents actually drafted or filed the in rem complaint, sought the seizure warrant, participated in the seizure, mismanaged the seized property, negotiated a release from Schrob or made false statements to the press. The district court found that the complaint sufficiently alleged that Catterson acted "in cahoots" with the Agents. App. at 26. Because we must review the complaint in the light most favorable to Schrob on this motion to dismiss, see D.P. Enters., Inc., 725 F.2d at 944, we will reject at this stage the Agents' contention that the complaint "fails to specify any conduct by [the Agents] that violated clearly established rights of which a reasonable agent should have been aware." See Brief for Appellants at 18.
 
 
 67
 The district court correctly determined that dismissal on a 12(b)(6) motion in this case was premature and that the case would be better decided on summary judgment. Although the district court erred in failing to dismiss those counts against Catterson precluded by absolute immunity, it was correct in its belief that supplementation of the record was necessary to resolve all of the other immunity issues in this case. Until the record is so expanded, resolution of the qualified immunity of Catterson and the Agents is not possible. We therefore express no opinion as to the "objective reasonableness" of Catterson's and the Agents' actions which may turn out to be protected by qualified immunity. The district court is in a better position to resolve these issues on a motion for summary judgment after supplementation of the record.
 
 
 68
 Finally, in analyzing the immunity issues this case presents, our independent research uncovered two statutes that the parties did not refer to, but that may be material. They are:
 
 
 69
 Except as provided in sections 2234 and 2235 of Title 18, no civil or criminal liability shall be imposed by virtue of this subchapter upon any duly authorized Federal officer lawfully engaged in the enforcement of this subchapter....
 
 21 U.S.C.A. § 885(d).[19]
 
 70
 Upon the entry of judgment for the claimant in any proceeding to condemn or forfeit property seized under any Act of Congress, such property shall be returned forthwith to the claimant or his agent; but if it appears that there was reasonable cause for the seizure, the court shall cause a proper certificate thereof to be entered and the claimant shall not, in such case, be entitled to costs, nor shall the person who made the seizure, nor the prosecutor, be liable to suit or judgment on account of such suit or prosecution.
 
 
 71
 28 U.S.C.A. § 2465.
 
 
 72
 Constrained by the limitations of an adversary system that seeks truth through the parties' development of their own positions, we will not on our own speculate about their effect on the issues of absolute immunity we have already decided in this appeal. Instead, we merely mention them so that the parties may consider what effect, if any, they may have on the issues still open in this case and decide for themselves what use to make of them in developing their positions on those remaining issues as this litigation continues to unfold.
 
 VII.
 
 73
 For all of the above reasons, the order of the district court denying Catterson's and the Agents' motion to dismiss is affirmed in part and reversed in part. Those portions of the district court's order denying the 12(b)(6) motion to dismiss the claims Schrob asserts concerning Catterson's actions in drafting and filing the in rem complaint, drafting and applying for the seizure warrant, and making statements in the warrant hearing are reversed. The district court on remand is instructed to modify its order in a manner consistent with this opinion by dismissing them on the grounds of absolute immunity. The remaining Bivens claims are remanded to the district court for a determination, in accordance with this opinion, of whether qualified or statutory immunity shields Catterson and the Agents from liability on these claims.[20]
 
 
 
 [1]
 Matawan's claim in this action is stayed as a result of its filing for bankruptcy in December 1990. Barbara Schrob's sole claim is for loss of consortium, a claim not at issue on this appeal. Thus, Irwin Schrob is the sole appellant
 
 
 [2]
 The in rem complaint specified that Esposito contributed $180,000 to the partnership, Zarelli contributed $120,000 and Schrob $50,000
 
 
 [3]
 Esposito was convicted of these charges on July 29, 1989
 
 
 [4]
 Catterson and the Agents have raised in their brief for the first time a subsidiary argument concerning the legal sufficiency of Schrob's Bivens claim. Brief for Appellants at 15 n. 6. We took jurisdiction over this case under the Cohen collateral order doctrine to resolve only the immunity question. See Notice of Appeal, App. at 81-82. We follow the direction of the Supreme Court that "[a]n appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim." Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985); see Harlow v. Fitzgerald, 457 U.S. 800, 805 n. 10, 820 n. 36, 102 S.Ct. 2727, 2731 n. 10, 2739 n. 36, 73 L.Ed.2d 396 (1982) (declining to resolve sufficiency of Bivens claim while considering immunity question under collateral order doctrine). The legal sufficiency of a Bivens cause of action is not a question of subject matter jurisdiction which may be considered by this Court at any time. See Bush v. Lucas, 462 U.S. 367, 374, 103 S.Ct. 2404, 2409, 76 L.Ed.2d 648 (1983). Even if Catterson and the Agents had sought to dismiss the Bivens claim in the district court for failure to state a claim, instead of solely on immunity grounds, the district court's denial of this motion would not be an appealable final order
 Brown v. Grabowski, 922 F.2d 1097, 1110 (1990), in which we rejected the dicta in Bonitz v. Fair, 804 F.2d 164, 166 (1st Cir.1986), that the restrictions Mitchell places upon review of a denial of qualified immunity prevents us from even determining "whether the plaintiffs actually state a claim," is inapposite to the Bivens question we face here. In Brown, in reviewing a denial of a summary judgment motion alleging qualified immunity, we examined whether the right the defendant official was alleged to have violated was clearly established. We allowed examination of the merits only to the extent necessary to determine whether the claimed right "was established in the first place." Id. The Bivens question raised in this case is distinguishable. Our examination of Catterson's entitlement to absolute immunity requires only an analysis of his actions and not what rights of Schrob were allegedly violated. With respect to qualified immunity, the record before us on this motion to dismiss is so limited that we cannot decide whether the rights that Catterson and the Agents allegedly violated were clearly established, or even established in the first place. In any event, since the issue was never presented to the district court, it is not appropriately considered at this time.
 
 
 [5]
 The procedural difference between absolute and qualified immunity is significant. Absolute immunity defeats a suit at the outset, while an official with qualified immunity must establish that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)
 
 
 [6]
 This case was briefed before the Supreme Court handed down its decision in Burns. The parties provided this Court with supplemental information pursuant to Federal Rule of Appellate Procedure 28(j) which provides:
 When pertinent and significant authorities come to the attention of a party after the party's brief has been filed, or after oral argument but before decision, a party may promptly advise the clerk of the court, by letter, with a copy to all counsel, setting forth the citations. There shall be a reference either to the page of the brief or to a point argued orally to which the citations pertain, but the letter shall without argument state the reasons for the supplemental citations. Any response shall be made promptly and shall be similarly limited.
 Fed.R.App.P. 28(j). In this case, however, far more than the limited citations and descriptions were provided. Indeed, the parties might have successfully taken the opportunity to petition the court to allow supplemental briefing. They should not have done so through a Rule 28(j) letter. Although the Government's letter merely flirted with violation of the rule, Schrob's response was clearly argumentative and improper, and, to make matters worse, was filed almost one month after receipt of the Government's letter. Although we will not assign sanctions at this juncture, these actions were indeed sanctionable, and we take this opportunity to warn counsel to follow the rules more strictly in the future.
 
 
 [7]
 The following allegations in Schrob's complaint fall into this category:
 
 
 [3]
 Defendant ... CATTERSON ... was responsible for the initiation and verification of the In Rem proceeding
 ....
 
 
 [16]
 [T]he United States Attorney commenced a Complaint In Rem ... to forfeit, among other things, certain real and personal property of [Matawan], Schrob and others pursuant to the civil forfeiture provisions of 21 U.S.C. § 881(a)
 
 
 [17]
 The In Rem Complaint reveals that ... defendants had knowledge that [Matawan] was formed and originally owned by Schrob, Esposito and Zarelli, and that Esposito was merely one of three original shareholders, but that it could not be verified that the source of the funds Esposito contributed to the company were drug-related
 
 
 [18]
 Although the In Rem Complaint alleged, in conclusory fashion, that Esposito was engaged in illegal drug transactions in 1983 through 1984, no allegations were made of illegal drug activity relating to either Schrob or the operations of [Matawan]. Indeed, at no time relevant hereto has there ever been any allegation of illegal activity on the part of Schrob or [Matawan]
 
 
 [19]
 Despite the defendants' knowledge of Schrob's ownership interest in [Matawan] and the total absence of allegations of wrongdoing as to Schrob or the operations of [Matawan] ... the In Rem complaint alleged that:
 
 
 [22]
 The defendant one hundred percent of the shares of the corporation Matawan Building Supplies is the proceeds of, and is directly traceable to, the sale, manufacture, transportation, and/or distribution of a controlled substance
 ....
 
 
 [40]
 Defendants ... acted and/or omitted to act in a manner which deprived them of the[ir constitutional] rights ... in that they, among other things:
 a. failed to diligently investigate this matter to determine whether or not the assets sought to be arrested and forfeited were, in fact, subject to seizure;....
 App. at 35, 40, 41 & 50.
 
 
 [8]
 "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States ... shall be fined not more than $1,000 or imprisoned not more than one year or both...." 18 U.S.C.A. § 242
 
 
 [9]
 Property subject to civil forfeiture is seized pursuant to process issued under the Supplemental Rules for Certain Admiralty and Maritime Claims, or in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure. See 21 U.S.C.A. § 881(b) (West 1981 & Supp.1991). The provisions of the customs laws relating to seizure, forfeiture, the disposition of seized property, and remission and mitigation of forfeiture are also applicable. See id. § 881(d). If the value of the seized property does not exceed $500,000, the property is subject to administrative forfeiture. See 19 U.S.C.A. § 1607 (West Supp.1991). The government must post notice of such seizure. Id. A person claiming an interest in the property has several options. The claiming party can do nothing, in which case the property forfeits to the government. See id. § 1609 (West Supp.1991). The party can petition the appropriate governmental official for remission and return of the seized property. See id. § 1618 (West Supp.1991); 21 C.F.R. §§ 1316.79-1316.80 (1991). This remedy allows the government and claimant to resolve the dispute informally, rather than in a judicial forfeiture proceeding. See United States v. Von Neumann, 474 U.S. 242, 245-46, 106 S.Ct. 610, 612-13, 88 L.Ed.2d 587 (1986). Generally, once the government has made an administrative determination on the petition, courts have no power to review that decision. See United States v. Kravitz, 738 F.2d 102, 105 (3d Cir.1984), cert. denied, 470 U.S. 1052, 105 S.Ct. 1752, 84 L.Ed.2d 816 (1985); McCoy v. United States, 758 F.Supp. 299, 302 (E.D.Pa.1991). Alternately, the claiming party can file a claim and bond for costs thereby requiring the government to seek judicial forfeiture in a court hearing. See 19 U.S.C.A. § 1608 (West Supp.1991); 29 C.F.R. §§ 1316.75-1316.77 (1991). A claiming party could also offer to pay the value of the seized property in order to obtain a release of the property. 19 U.S.C.A. § 1614 (West Supp.1991)
 If the value of the seized property is in excess of $500,000, the "United States attorney for the district in which the seizure was made [shall institute] proper proceedings for the [forfeiture] of such property." 19 U.S.C.A. § 1610 (West Supp.1991). The government has the burden at a forfeiture proceeding of showing probable cause for the seizure of the property. United States v. $55,518.05 in U.S. Currency, 728 F.2d 192, 195 (3d Cir.1984); 19 U.S.C.A. § 1615 (West 1980 & Supp.1991). If the government meets its burden, the owner then has the burden of establishing innocent ownership. See $55,518.05 in U.S. Currency, 728 F.2d at 195; 19 U.S.C.A. § 1615. If the government cannot meet its burden, the claiming party is entitled to the return of his property, and may also be entitled to costs. See 28 U.S.C.A. § 2465 (West 1978).
 Subsequent to the seizure in this case, the Attorney General and Secretary of the Treasury have issued, and Congress has enacted, expedited administrative procedures for seizures under the Comprehensive Drug Abuse Prevention and Control Act. See 21 U.S.C.A. § 888 (West Supp.1991); 29 C.F.R. §§ 1316.90-1316.99. These procedures apply only in forfeitures involving conveyances, see 21 U.S.C.A. § 888, and would not apply in this case in any event. For a useful discussion of the intricacies of the forfeiture laws, see D. Smith, Prosecution and Defense of Forfeiture Cases (1991).
 
 
 [10]
 "Except as provided in sections 2234 and 2235 of Title 18, no civil or criminal liability shall be imposed by virtue of this subchapter upon any duly authorized Federal officer lawfully engaged in the enforcement of this subchapter...." 21 U.S.C.A. § 885(d)
 
 
 [11]
 The following allegations of Schrob's complaint fall in this category:
 
 
 [3]
 Defendant ... CATTERSON was responsible for ... the application for the Warrant for Arrest of Article[s] In Rem and the Seizure Warrant
 ....
 
 
 [20]
 Pursuant to the In Rem Complaint, defendant Catterson sought issuance of the Warrants directing the United States Marshal to seize, among other things, the property of Schrob and the property and business operations of [Matawan], and other property which the government alleged to be owned by [Matawan] but which, in fact, was not owned by [Matawan]
 ....
 
 
 [24]
 On January 5, 1988, the Seizure Warrant, in the form prepared, upon information and belief, by or at the direction of Defendant Catterson, was issued, authorizing the United States Marshal to seize [the property identified in the warrant]
 
 
 [25]
 At the time Catterson prepared, or caused the preparation of, the proposed form of Seizure Warrant he knew, or had reason to know, that the statements contained therein were materially inaccurate and misleading and that the Court would be deceived
 ....
 
 
 [40]
 Defendants
 b. improperly prosecuted the ex parte application for the Warrants without complying with, among other things, the specificity requirements of Rule E(2)(a) of the Supplemental Rules of Civil Procedure;
 e. sought issuance of said Seizure Warrant without probable cause to believe that the owners of the assets to be seized were involved in any drug-related or other criminal activity or that assets were in any way traceable to an exchange of money for drugs....
 App. at 35, 42-44, 50-51.
 
 
 [12]
 As discussed above, in Malley v. Briggs the Supreme Court held that a police officer's action in seeking an arrest warrant is only protected by qualified immunity. Thus, Patterson appears to hold the policeman and the prosecutor to different standards for the same conduct. See Burns, 111 S.Ct. at 1944 ("[I]t is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity."). The Patterson court cited Malley but did not consider the differing standards applied to policeman and prosecutors. Instead, the court focused on the fact that the arrest was not purely investigatory, but necessary to the prosecution and thus a core prosecutorial function. See Patterson, 795 F.2d at 554
 
 
 [13]
 As authorized by 21 U.S.C.A. § 881(b), the prosecutor can either seek a seizure warrant under Rule C(3) of the Supplemental Rules for Certain Admiralty and Maritime Claims, or under Federal Rule of Criminal Procedure 41. An admiralty warrant cannot issue without the filing of a forfeiture complaint. Under Rule C(3), once an in rem complaint is filed, "the clerk ... shall forthwith issue a summons and warrant for the arrest of the vessel or other property...." Although the warrant issues automatically without a showing of probable cause, the seizure is still subject to challenge under Fed.R.Crim.P. 41(e) for lack of probable cause. See also 19 U.S.C.A. § 1615 (government has burden of demonstrating probable cause at forfeiture proceeding); 28 U.S.C.A. § 2465 (prosecutor must have probable cause before instituting forfeiture action)
 When the prosecutor seeks a seizure warrant under Federal Rule of Criminal Procedure 41, there is no requirement that a forfeiture action be filed and the issuing magistrate judge must determine that probable cause exists for the seizure. See Fed.R.Crim.P. 41(c). For a discussion of the differences between admiralty warrants and warrants issued under Rule 41, see 1 D. Smith, supra note 9, p 10.05 (1991).
 
 
 [14]
 Paragraphs 21, 22 and 23 of Schrob's complaint fall into this category. Perhaps more concisely, paragraph 40 alleged:
 
 
 [40]
 Defendants
 c. failed to disclose to the Court a prior opinion of that Court specifically denying the identical relief sought in a nearly identical and related proceeding;
 d. made misrepresentations of fact to the Court in support of the application for the seizure warrant....
 
 
 [15]
 We consider the following allegations to fit into this category:
 
 
 [3]
 Defendant ... CATTERSON ... was responsible for ... the seizure and the acts and/or omissions relating to the investigation and/or seizure which are the subject of this complaint
 ....
 
 
 [26]
 Shortly after the warrants were signed, on January 5, 1988, approximately thirty (30) Deputy United States Marshals and other agents of the federal government ... descended upon [Matawan's] premises in Matawan, New Jersey and served and executed the Warrants on one hundred percent (100%) of the shares of [Matawan] and all of its assets, including bank accounts and inventory. Customers on the premises were directed to leave
 
 
 [27]
 Simultaneously with the seizure, some of the employees who were key to the on-going operation of the business were fired or ordered to leave by the federal officers. Schrob was advised that seizure warrants had been served upon bank accounts of [Matawan] and that those accounts had been frozen. Locks were changed and the computer was accessed and the access code was changed
 
 
 [28]
 As a result of the seizure, the normal business activities of [Matawan] came to a screeching halt. [Matawan] could not order supplies and inventory for its customers since its bank accounts were frozen. [Matawan] lost all or some of its lines of credit with banks or suppliers. Federal officers directed some employees to leave the premises and not to return until they received word otherwise
 
 
 [29]
 On January 6, 1988, an article appeared in the Asbury Park Press, a newspaper which is widely circulated in the communities served by [Matawan], which stated that "U.S. Marshals and Drug Enforcement Administration agents seized ... business assets ... of a Holmdel township man" charged with purchasing "them with profits from cocaine sales." The article further detailed:
 Special Agent Robert Strang said about 30 U.S. marshals from New York City and Newark plus New York City DEA agents seized Matawan Building Supply Inc[.] ...
 
 
 [30]
 Immediately after the seizure, Schrob gathered documentary evidence demonstrating that he had invested his own money ... and proving that Esposito had only capitalized one-third of [Matawan]. The day after the seizure, January 6, 1988, representatives of Schrob and [Matawan] met with defendant Catterson and demonstrated the legitimacy of Schrob's investment and that Esposito had only capitalized one-third of the business. The representatives demanded the return of Schrob to control of [Matawan] and requested a court-ordered stipulation immediately restoring him to full management authority over the operations of [Matawan]
 
 
 [31]
 The following day, January 7, 1988, Catterson finally agreed "in principal" to return management of the business to Schrob, but demanded unreasonable and unjustified fiscal, accounting and other restrictions on the operation of the business and on the activities of a number of employees, despite Catterson's repeated assurances that there was not a single allegation of any impropriety against Schrob or the operation of [Matawan]. Notwithstanding the immediate concession of Schrob to these unreasonable demands, Catterson and others wrongfully continued to seek further restrictions on the business and otherwise wrongfully delayed the submission and entry of the stipulation which would return some control of [Matawan] to Schrob. As a result of the defendants' wrongful delays, which included delays occasioned by Catterson's improper negotiations for a release from personal liability for his actions in the matter, the business of [Matawan] suffered irreparably
 ....
 
 
 [35]
 [Matawan] and Schrob have been further plagued by the taint of adverse and erroneous publicity generated by press conferences and press releases of federal officers surrounding the seizure, including erroneous statements that the operations of [Matawan] were related to drug activities, that the company was under the complete control of government officials, and that the company would soon be sold. Notwithstanding several requests made by plaintiffs, defendants and other federal officials have failed to issue any statements to the press to correct the erroneous information contained in the initial press releases and comments of defendants, upon which the false statements in the initial articles were based
 
 
 [36]
 At the government's insistence, a new bookkeeper was inserted at [Matawan] and directed to report to the marshals. Without explanation, the former bookkeeper for [Matawan] was barred from accessing the company's computer and books, despite the fact that at this critical time the bookkeeping function required her participation and attention. The federal officers' actions in this regard created a serious morale problem among the remaining [Matawan] employees
 
 
 [37]
 As a consequence of the foregoing interference by the federal officers, the bookkeeping, billings and collection activities were severely and negatively impacted
 ....
 
 
 [40]
 Defendants
 f. unduly and unreasonably delayed the rectification of the factual misrepresentations made to the Court and wrongfully delayed the restoration of the control of [Matawan] to Schrob;
 g. unlawfully sought a personal indemnification release as a condition to any rectification of the record;
 h. were responsible for false statements reported in the press and made to members of the public with respect to the plaintiffs;
 i. interfered with plaintiffs relationships, both personal and financial, with numerous individuals and institutions;
 j. wrongfully terminated the employment of key employees of [Matawan]; and
 k. were responsible for the mismanagement of [Matawan] and the wasting of assets of [Matawan] and the loss of business opportunities for plaintiffs as a result of the wrongful seizure of [Matawan].
 App. at 35, 44-52.
 
 
 [16]
 We note that the Federal Tort Claims Act specifically exempts the United States government from liability for the detention of property by its employees. See 28 U.S.C.A. § 2680(c) (West 1965)
 
 
 [17]
 The complaint alleges only that Catterson was "responsible" for these statements and not that he made them. See supra note 15. The newspaper article itself attributed the statements to Special Agent Robert Strang. Id. Catterson's responsibility for these statements may become an issue for the district court on remand
 
 
 [18]
 The purpose of qualified immunity and the procedure the district court should follow in determining its applicability has been outlined by the Supreme Court as follows:
 [O]n remand, it should first be determined whether the actions the [plaintiffs] allege [the defendant official] to have taken are actions that a reasonable [official] could have believed lawful. If they are, then [the official] is entitled to dismissal prior to discovery. If they are not, and if the actions [the official] claims he took are different from those the [plaintiffs] allege (and are actions that a reasonable [official] could have believed lawful), then discovery may be necessary before [the official's] motion for summary judgment on qualified immunity grounds can be resolved. Of course, any such discovery should be tailored specifically to the question of [the official's] qualified immunity.
 Anderson, 483 U.S. at 647 n. 6, 107 S.Ct. at 3043 n. 6 (emphasis added).
 
 
 [19]
 The noted exceptions under 18 U.S.C.A. §§ 2234 & 2235 provide criminal liability of imprisonment up to one year or a $1,000 fine for seeking a search warrant maliciously or without probable cause, or for willfully exceeding authority in exercising a warrant
 
 
 [20]
 After this appeal was argued, Catterson and the Agents moved to stay discovery pending its resolution. In that respect, the motion is dismissed as moot insofar as this appeal is concerned. Insofar as it seeks to stay discovery pending resolution of a related appeal at No. 91-5669, the motion is denied because it is not properly before this panel. We note that Catterson's and the Agents' appeal at 91-5669 was itself stayed on the government's motion pending disposition of this appeal at 90-6051. Thereafter Schrob moved to dismiss the appeal at 91-5669 for lack of appellate jurisdiction. All motions concerning the stayed appeal at 91-5669 are before a motions panel of this Court where they remain pending